The STATE ex rel. the JUDGES OF the TOLEDO MUNICIPAL COURT

v.

The MAYOR OF the CITY OF TOLEDO et al.

[Cite as State ex rel. Judges of Toledo Mun. Court v. Mayor of Toledo, 179 Ohio App.3d 270, 2008-Ohio-5914.]

Court of Appeals of Ohio,
Sixth District, Lucas County.

No. L–08–1236.

Decided Nov. 14, 2008.

Keith Wilkowski and Paul R. Bonfiglio, for relators.

Adam Loukx, City of Toledo Acting Law Director, and John T. Madigan, City of Toledo General Counsel, for respondents.

SINGER, Judge.

{¶ 1} Relators, the judges of the Toledo Municipal Court, have filed a motion for summary judgment regarding funding for certain court expenses. Respondents, the Toledo mayor and council members, have responded in opposition to that motion, and the parties have submitted an agreed statement of facts. The two main issues presented by this action are (1) whether relators may determine the number and type of security officers needed in the court and compel respondents to fund such security needs and (2) whether relators may determine the need for drug testing of defendants who have been released pending trial and compel respondents to fund such testing.

{¶ 2} Since 1976, the Lucas County Sheriff has provided deputies for security services at the Toledo Municipal Court under a contract between Toledo and the Lucas County Commissioners. In November 2007, the 2008 proposed city budget reduced funding for court security by 40 percent, a reduction from $1,864,390 in 2007 to $1,120,332 for 2008. After some discussion between relator Judge Timothy Kuhlman and Toledo City Council, the ultimate funding for security was set at $1,679,640. To stay within this budget, the number of deputies was reduced from 24 to 22. Ultimately, an agreement between the parties was reached to reduce the number to 23 deputies, beginning on June 2, 2008.

{¶ 3} On June 18, 2008, after using 23 deputies for two weeks, relators determined that the reduced number, even by one, caused safety and security problems in the court. Relators directed the Lucas County Sheriff to return to the use of 24 deputies. The sheriff agreed to relators' directive, but wanted

confirmation that funding would be provided. In response, the city's acting chief of staff/safety director sent a letter to the sheriff stating that no additional funding would be provided for 2008 beyond the original budgeted amount.

{¶ 4} On July 11, 2008, relators ordered respondents to restore funding for all 24 deputies needed for security at the court, determining that a total $1,809,640 was necessary to cover security costs for 2008. Although this total was $130,000 more than the original approved amount, it was still less than the total cost for court security in 2007.

{¶ 5} During the previously noted events affecting the 2008 security funding, future contracts and funding for court security became an issue. On May 6, 2008, Robert Reinbolt, the Toledo mayor's chief of staff, informed the sheriff by letter that the city of Toledo would cease contracting with the Lucas County sheriff's office for security services. The letter stated that it was the city's intent to instead "utilize part-time employees for security" beginning in January 1, 2009.

{¶ 6} On June 5, 2008, relator, Judge Kuhlman, met with Reinbolt, city council members, the Toledo police chief, and the Lucas County sheriff, to discuss the new proposal to use part-time employees. On June 9, 2008, Judge Kuhlman explained in a letter to the mayor and the president of city council why the new proposal was not acceptable to the court. Also on June 9, 2008, the Toledo Municipal Court judges issued an order to respondents to authorize and enter into any necessary contracts for the funding for 24 deputies for security services to be provided by the Lucas County sheriff's office for the 2009 fiscal year. Relators determined that the cost of security for 2009 would be $1,951,790, which included a three percent increase from the 2008 budget amount. As of October 14, 2008, respondents had not complied with the June 9, 2008 order.

{¶ 7} In addition, respondents determined that they would no longer fund the court's drug-testing program for certain defendants whose release on bail pending trial was conditioned on periodic testing. Although the court has reduced its overall use of drug testing as a pretrial bail condition, as well as the number of drugs screened, relators allege that the minimum needed to administer the program is $45,000. On May 30, 2008, the court issued an order directing the respondents to add $45,000 to the court's budget for pretrial drug testing through the Lucas County centralized drug-testing unit. On July 15, 2008, a vote regarding the funding was taken, resulting in a six-to-six tie, with the tie-breaking "no" vote cast by the mayor. As of October 14, 2008, respondents have also not complied with this order.

{¶ 8} Relators filed the instant action in mandamus, seeking to compel respondents to comply with the court orders issued regarding security funding and officers and funding of the pretrial drug testing program. Respondents state that the Toledo's general operating-fund budget will have a three-to-seven-million

dollar deficit by the end of 2008, which is expected to continue into 2009, under current economic and financial conditions. The city has not yet laid off any employees or tapped into its economic-stabilization reserve fund, which has a balance of $6.2 million. Respondents claim that Ohio law gives them, the legislative authority, control over the details of the court-security services, including the number of officers and what entity will provide those services.

{¶ 9} For this court to grant a writ of mandamus, relators must establish (1) a clear legal right to the requested relief, (2) a clear legal duty to perform these acts on the part of respondents, and (3) the lack of a plain and adequate remedy in the ordinary course of law. *State ex rel. Neff v. Corrigan* (1996), 75 Ohio St.3d 12, 16, 661 N.E.2d 170. The "function of mandamus is to compel the performance of a present existing duty as to which there is a default. It is not granted to take effect prospectively, and it contemplates the performance of an act which is incumbent on the respondent when the application for a writ is made." *State ex rel. Willis v. Sheboy* (1983), 6 Ohio St.3d 167, 6 OBR 225, 451 N.E.2d 1200, paragraph two of the syllabus.

{¶ 10} In *State ex rel. Donaldson v. Alfred* (1993), 66 Ohio St.3d 327, 329, 612 N.E.2d 717, the Supreme Court of Ohio declared:

{¶ 11} "Ohio courts have the inherent power to order the funding necessary to fulfill their purposes. *State ex rel. Johnston v. Taulbee* (1981), 66 Ohio St.2d 417, 20 O.O.3d 361, 423 N.E.2d 80; *State ex rel. Foster v. Lucas Cty. Bd. of Commrs.* (1968), 16 Ohio St.2d 89, 45 O.O.2d 442, 242 N.E.2d 884. A coordinate branch of government may not impede a court's business by refusing reasonable funding requests. *Johnston,* supra; *Foster,* supra. The determination of necessary administrative expenses rests solely with the court, and another branch of government may not substitute its judgment for that of the court. See *Foster,* supra, paragraph three of the syllabus. Funding orders enjoy a presumption of reasonableness. A funding authority refusing to obey a funding order bears the burden to demonstrate that the order constitutes an abuse of discretion and is unreasonable. *State ex rel. Durkin v. Youngstown City Council* (1984), 9 Ohio St.3d 132, 9 OBR 382, 459 N.E.2d 213, * * *."

{¶ 12} Further, the Ohio Supreme Court declared that the doctrine of separation of powers provides that courts must be free "from excessive control of the legislative and executive branches in order to ensure their independence and integrity." *Donaldson,* 66 Ohio St.3d at 329, 612 N.E.2d 717, citing *Johnston,* 66 Ohio St.2d at 420–421, 20 O.O.3d 361, 423 N.E.2d 80 and *Zangerle v. Cuyahoga Cty. Court of Common Pleas* (1943), 141 Ohio St. 70, 25 O.O. 199, 46 N.E.2d 865. These doctrines and concepts apply to municipal courts. See *Donaldson* at 330, 612 N.E.2d 717.

{¶ 13} Nevertheless, a court's power to demand funding from a legislative authority is not without limits. To determine reasonableness, one of the factors that may be considered is the funding authority's financial status. *Donaldson* at 329–330, 612 N.E.2d 717, citing *Durkin,* 9 Ohio St.3d at 134, 9 OBR 382, 459 N.E.2d 213; *State ex rel. Britt v. Bd. of Franklin Cty. Commrs.* (1985), 18 Ohio St.3d 1, 18 OBR 1, 480 N.E.2d 77. In *Britt,* the Franklin County Pleas Court's request for long overdue and warranted court-personnel salary increases was ultimately deemed to be unreasonable because the increase in a single budget year was too great and would have caused an undue strain on the county finances. Id. at 5, 18 OBR 1, 480 N.E.2d 77. Nonetheless, the Supreme Court of Ohio also noted that upon the submission of an amended budget by the municipal court, the board of commissioners should "review it and immediately take all reasonable and necessary steps in order to provide the funds as requested by relators." Id.

{¶ 14} Additionally, a municipality may deny even reasonable funding requests by a municipal court if the General Assembly has placed discretion over a particular budget item with the municipal legislative authority. See *State ex rel. Cleveland Mun. Court v. Cleveland City Council* (1973), 34 Ohio St.2d 120, 63 O.O.2d 199, 296 N.E.2d 544 (city has discretion whether to fund certain support staff positions and equipment). Nonetheless, any determination of the reasonableness of a funding order must also consider the necessary preservation of the proper balance of power among the three branches of government. *Britt,* 18 Ohio St.3d at 3, 18 OBR 1, 480 N.E.2d 77. It "may well be said that it is the duty of such other branches of government to facilitate the administration of justice by the judiciary." *State ex rel. Foster v. Lucas Cty. Bd. of Commrs.* (1968), 16 Ohio St.2d 89, 92, 45 O.O.2d 442, 242 N.E.2d 884. With these principles and concepts in mind, we will now address the issues before us.

{¶ 15} R.C. 1901.36, provides:

{¶ 16} "(A) * * * *The legislative authority shall provide any other employees that are necessary,* each of whom shall be paid such compensation out of the city treasury as the legislative authority prescribes, except that the compensation of these other employees in a county-operated municipal court shall be paid out of the treasury of the county in which the court is located, as the board of county commissioners prescribes. *It shall provide* all necessary form books, dockets, books of record, and all supplies, including telephone, furniture, heat, light, and janitor service, and for *such other ordinary or extraordinary expenses as it considers advisable or necessary for the proper operation or administration of the court.*" (Emphasis added.)

{¶ 17} Thus, because R.C. 1901.36 generally indicates that the legislative authority must fund "other employees that are necessary," it does not specify with particularity that the legislative authority may determine which security

services are necessary, including the provider or number and type of security officers. Thus, to determined what is "necessary" to provide adequate courthouse security, we must look to the Supreme Court of Ohio Rules of Superintendence.

{¶ 18} Although not mandatory, the Rules of Superintendence should be the guidelines to determine whether municipal court facilities and security programs are suitable. See *State ex rel. Hillyer v. Tuscarawas Cty. Bd. of Commrs.* (1994), 70 Ohio St.3d 94, 99, 637 N.E.2d 311; *State ex rel. Taylor v. Delaware* (1982), 2 Ohio St.3d 17, 18, 2 OBR 504, 442 N.E.2d 452. The Supreme Court of Ohio Rules of Superintendence, Appendix C, pertaining to court security standards, provides:

{¶ 19} "PREAMBLE

{¶ 20} "Ohio courthouses represent justice and reason. Court facilities must be safe and secure for all those who visit and work there.

{¶ 21} "The Court Security Standards balance many competing concerns. The Supreme Court/Judicial Conference Committee on Court Security recognizes that there has been an increase in the use of weapons in our society. The Committee recognizes that providing security carries a financial price. The Committee also recognizes the diversity of the court system—urban and rural, large and small— and that courts deal with emotional issues. The Standards attempt to balance the diverse interests in each community by the use of local court security advisory committees for each trial and appellate court. The committees will be comprised of a broad range of interested community parties, and will examine each court's security needs, including the facilities and the resources available, and adopt a plan that addresses the unique needs of that court.

{¶ 22} "These standards are not mandates. Rather, they are goals to which the courts should aspire to ensure safe access to all.

{¶ 23} "CSS 1 Security policy and procedure manual

{¶ 24} "A written Security Policy and Procedures Manual governing security of the court and its facilities shall be established by each court to ensure consistent, appropriate and adequate security procedures. The manual shall include: a physical security plan, routine security operations, a special operations plan, a hostage situation response plan, a high risk trial plan, and emergency procedures (fire, bomb, disaster).

{¶ 25} " * * *

{¶ 26} "CSS 4 Court security officers

{¶ 27} "A. Uniformed, armed law enforcement officers should be assigned *specifically, and in sufficient numbers* to court security, to ensure the security of each court and court facility.

{¶ 28} "B. All security officers assigned to court security should be certified through the Ohio Peace Officers Training Council. These officers should receive specific training on court security and weapons instruction specific to the court setting.

{¶ 29} " * * *

{¶ 30} "CSS 6 Prisoner transport within court facilities

{¶ 31} "A. Prisoners should be transported into and within the court facility through areas which are not accessible to the public. When a separate entrance is not available and public hallways must be utilized, prisoners should be handcuffed behind the back and, when appropriate, secured by leg restraints.

{¶ 32} "B. Prisoners should be held in a secure holding area equipped with video monitoring, where practicable, while awaiting court hearings and during any recess."

{¶ 33} The Supreme Court of Ohio has addressed the conflict between the municipality's duty to the municipal court under R.C. 1901.36 and financial budget concerns. *Taylor*, 2 Ohio St.3d at 18–19, 2 OBR 504, 442 N.E.2d 452. In *Taylor*, the Supreme Court concluded that the Delaware Municipal Court facilities were not adequate under R.C. 1901.36 and granted the writ of mandamus filed by the municipal judge. Id. *Taylor* noted that "this court is not unmindful of the present financial problems being experienced by political subdivisions in the state. Of necessity, those problems must be taken into account by both relator and respondents in satisfying the mandatory obligations imposed by R.C. 1901.36." Id. Notwithstanding the city's financial conditions, however, the Supreme Court did not relieve the city of Delaware from its statutory duty and required it to provide suitable municipal court facilities.

{¶ 34} In a recent case, the Fourth District Court of Appeals also addressed a city's failure, under R.C. 1901.36, to adequately fund and provide suitable accommodations for a municipal court, including court security and prisoner detention. *State ex rel. Badgett v. Mullen*, 177 Ohio App.3d 27, 2008-Ohio-2373, 893 N.E.2d 870.[1] *Badgett* applied the Rules of Superintendence regarding court security and held that although the city's financial condition had some bearing on the issues, it could not excuse the city's duty to comply with R.C. 1901.36. Id., ¶ 18, fn. 1. The appellate court concluded that despite financial difficulties, the city was required to provide suitable accommodations to prevent interference with the municipal court's operations and inherent authority "to effectuate the

---

1. We note that *Badgett* was accepted on appeal to the Supreme Court of Ohio, was referred to mediation, and was then remanded to the court of appeals to implement the settlement agreement of the parties. Our recommendation of mediation to the parties in this case has gone unutilized to date.

orderly and efficient administration of justice without monetary or procedural limitations by the legislature." Id., ¶ 49–50.

■ {¶ 35} In our view, Ohio's statutory scheme does not specifically reserve discretion to the legislative authority over the provider, the number of security officers needed, or the details of how those services are provided. Rather, R.C. 1901.36 requires that the legislative authority provide the "necessary" employees, including those needed for proper security. In addition, unlike court personnel who manage the court's documents, scheduling, and other "paper work," court security officers must have specialized training to deal with courtroom security, transportation and supervision of prisoners, and general courthouse security, addressing issues with the public-at-large in a variety of situations.

{¶ 36} As a result of the specialized nature of security services, upon consideration of the Rules of Superintendence and prior case law, we conclude that decisions regarding specific security requirements are within the municipal court's purview and control. The court's judges are in the best position to know how many officers are needed to effectively secure courtrooms and the courthouse, whether such officers should be full-time or part-time employees, and which agency would best be able to provide qualified officers.

{¶ 37} We are not unmindful of the city's concern about budgetary funding and projected financial conditions. Nevertheless, respondents do not claim that relators' cost proposals for 2008 or 2009 are facially groundless or unreasonable. Instead, the city appears to have merely reduced the court security budget as part of an "across-the-board" cut in overall expenses, and expected the court to accommodate the reduction by lowering court security levels. Because respondents have not shown that the amount requested by relators for 2008 or that the same system be implemented for 2009 to be unreasonable, we conclude that, as a matter of law, relators are entitled to summary judgment regarding the authority to make such decisions.

■ {¶ 38} We now turn to the drug-testing program. Respondents claim that pretrial drug testing is "unconstitutional," and, thus, is not a proper condition, as provided for under Crim.R. 46(B).[2] Respondents have no standing, however, to assert this claim on behalf of defendants in general. Further, Ohio courts' use of pretrial drug testing has never been held to be unconstitutional and, thus, an

---

2. {¶ a} Respondents cite Crim.R. 46(B), which states that the court may impose "any of the following conditions of bail":

{¶ b} " * * *

{¶ c} "(6) Require a person who is charged with an offense that is alcohol or drug related, and who appears to need treatment, to attend treatment while on bail;

{¶ d} "(7) Any other constitutional conditions considered reasonably necessary to ensure appearance or public safety."

279

improper funding request. When substance abuse is an issue, we conclude that conditioning a defendant's release on submitting to drug or alcohol testing serves the dual purpose of ensuring the defendant's later appearance in court and protection of public safety. Therefore, respondents' argument that the city should not be required to fund pretrial drug testing because the condition is "unconstitutional" is without merit.

{¶ 39} We will now determine whether respondents have the authority to refuse to fund the drug-testing program presented by relators. R.C. 1901.36 requires a legislative authority to pay for *"such other ordinary or extraordinary expenses as it considers advisable or necessary for the proper operation or administration of the court."* The Supreme Court of Ohio has "refused to excuse a governmental body from fulfilling its mandatory duty based upon a claim of hardship." *State ex rel. Durkin,* 9 Ohio St.3d at 134–135, 9 OBR 382, 459 N.E.2d 213, citing *Foster,* 16 Ohio St.2d at 91, 45 O.O.2d 442, 242 N.E.2d 884; *State ex rel. Motter v. Atkinson* (1945), 146 Ohio St. 11, 15, 31 O.O. 472, 63 N.E.2d 440. As we noted previously, "it is the duty of such other branches of government to facilitate the administration of justice by the judiciary." *Foster* at 92, 45 O.O.2d 442, 242 N.E.2d 884.

{¶ 40} Although not directly connected to court security, a municipal court must have a full range of options for pretrial-release conditions to ensure a defendant's appearance as well as to protect the public. Requiring drug testing as a condition of release on bond pending trial serves both purposes and is commonly used. Consequently, as long as the cost is reasonable, we again cannot say that a city's troubled finances should dictate whether such a program should be funded. In the present case, the city has failed to establish that the $45,000 cost of the program is not advisable or necessary for the proper operation or administration of the court. Thus, we conclude that relators' request for funding for that program is reasonable and within the court's inherent powers.

{¶ 41} Therefore, we conclude that material facts are not in dispute, and relators are entitled to judgment as a matter of law. Accordingly, relators' motion for summary judgment is granted.

{¶ 42} Pursuant to R.C. 2731.06, this court grants a writ of mandamus and orders respondents to comply with relators' orders regarding court security and pretrial drug testing program. Respondents are ordered to pay the costs of this action.

So ordered.

PIETRYKOWSKI, P.J., and HANDWORK, J., concur.